JUDGE PRESKA

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

07 CV 6131

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KEN JORDAN AND SCOTT KIRKLAND,  :
collectively p/k/a THE CRYSTAL METHOD  :
:
:
Plaintiffs,  :
vs.  :  Civil Action No:
:
SHERIDAN SQUARE ENTERTAINMENT,  :  Civil Complaint and Jury Demand
INC., f/k/a "V2 RECORDS" and VRNA, LLC.  :
:
Defendant.  :
:
- - - - - - - - - - - - - - - - - - - - - - - - x

JUN 2 9 2007

U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs KEN JORDAN and SCOTT KIRKLAND,  collectively p/k/a THE

CRYSTAL METHOD, through their undersigned counsel, Troutman Sanders LLP,

hereby complain of defendants, as follows:

**NATURE OF THE ACTION**

1.    By this action, plaintiffs, the members of the pioneer electronic "big beat"

dance band The Crystal Method, seek relief from defendants continued abridgment of

their rights.  Defendants, and perhaps their related companies, have been

contractually obligated to timely and properly account and pay to plaintiffs sums due

for exploitation of various recordings.  While defendants have realized an

overwhelming windfall as a result of plaintiffs' performance under the contract,

defendants have utterly failed to live up to their contract with, and responsibility to

plaintiffs, engaging in pervasive concealment of exploitation and payments, all to

plaintiffs' detriment.  Because defendants have failed to remedy their wrongdoing

Page 1

despite plaintiffs' repeated requests, which defendants have simply ignored, plaintiffs have been forced to bring this lawsuit.

## JURISDICTIONAL STATEMENT

2.    This is an action for breach of contract, wherein plaintiffs are citizens of and reside in different states from the defendants and the amount in controversy exceeds $75,000.00. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

3.    Plaintiff Ken Jordan ("**Jordan**") is a citizen of the state of California.

4.    Plaintiff Scott Kirkland ("**Kirkland**") is a citizen of the state of California.

5.    Upon information and belief, defendant SHERIDAN SQUARE ENTERTAINMENT, INC., f/k/a V2 Records ("**SSE**") is a corporation organized and existing under the laws of the State of Delaware, which has principle places of business at 59 West 19th Street, 6th Floor, New York, New York 10011.

6.    Upon information and belief, defendant VRNA, LLC ("**VRNA**") is a corporation organized and existing under the laws of the state of Delaware with a principle place of business at 14 East 4th Street, New York, New York, 10012.

7.    Upon information and belief, **SSE** and **VRNA** conducts business and derives substantial benefit from the State of New York.

8.    Upon information and belief, the conduct of **SSE** and **VRNA** complained of herein occurred within the State of New York.

9.    Upon information and belief, **SSE** has failed to continue acting as a proper corporation and may be used merely as the instrument of its officers, directors and/or shareholders, including without limitation Michael Olsen, Joseph Petlow, Joseph Bianco and/or Anil Narang.

**10.**    Upon information and belief, relative to the acts events and circumstances herein, the acts of **SSE** are the acts of Michael Olsen, Joseph Petlow, Joseph Bianco and/or Anil Narang, and the acts of Michael Olsen, Joseph Petlow, Joseph Bianco and/or Anil Narang are the acts of **SSE**.

**11.**    Upon information and belief, relative to the acts, events and circumstances herein, the acts of **SSE** are the acts of **VRNA** and vice versa.

**12.**    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a).

## BACKGROUND

**13.**    In 1993 **Jordan** and **Kirkland** formed the musical group known as The Crystal Method (hereinafter, **Jordan** and **Kirkland** are referred to collectively as "**TCM**").

**14.**    **TCM** is widely regarded as the pioneer of the so-called big beat electronic dance genre in the United States.

**15.**    **TCM** quickly became well known in the underground club culture in Los Angeles, California. **TCM**'s debut single, "Keep Hope Alive," became something of an anthem for that genre of music.

**16.**    **TCM** worked very hard to create a following, engaging in incessant live performances to further develop their goodwill. **TCM**'s increasing popularity both in the clubs and among radio disk-jockeys led to a deal with Outpost Recordings, which was distributed by Universal Music Group, Inc., in 1996.

**17.**    In 1997, **TCM** released the album "*Vegas*" which reached No. 92 on the BillBoard charts, and is a certified "Gold" album by the Recording Industry Association of America (the "RIAA"). Three songs from that album also reached the charts: *Busy Child* reached No. 33 on the Hot Dance charts; *Comin' Back* reached No.

1 on the Hot Dance charts; and *Keep Hope Alive* reached No. 14 on the Hot Dance charts.

18.     Over the next few years, **TCM** continued to tour and release new materials, remixes and extended play recordings.

19.     In 2001, **TCM** released its second album *"Tweekend,"* which reached the No. 1 position on the Top Electronic Albums chart; No. 6 on the Top Internet Albums chart and No. 6 on the Top Canadian Albums chart.

20.     In 2002, **TCM** released a remix/compilation album *"Community Service"* which reached the No. 5 position on the Top Electronic Albums chart and No. 15 on the Top Independent Albums chart.

21.     During this period of time, **TCM** released a few singles that also did well, including *Name of the Game* (from the *Tweekend* album) which reached the No. 5 position on the Hot Dance Tracks chart as well as No. 22 on the Modern Rock charts and *You Know it's Hard*, which reached the No. 7 position on the Hot Dance Tracks charts.

22.     Because **TCM**'s music is so broad in scope, and the subject of such commercial and critical acclaim, it can be found in numerous television shows, video games, commercials, trailers and feature films.

23.     Thus, for instance, **TCM**'s music is featured as the title theme for the FOX television series *Bones*, the title theme music for the NBC television series *Third Watch*, and featured on episodes of television shows such as *South Park*, *Alias* and *C.S.I.* and *Dark Angel*.

24.     Similarly, **TCM**'s music has been featured in such major motion pictures as *Blade II*, *Blade Trinity*, *Gone in Sixty Seconds*, *Lost in Space*, *Spawn*, *Zoolander*, *XXX*, *The Replacement Killers*, *Romeo Must Die* and the remake of *The Longest Yard*.

Page 4

25.    Not surprisingly, **TCM**'s music also has been featured in video games such as "Reservoir Dogs - The Video Game," "Tom Clancy's Splinter Cell," "FIFA '98: Road to World Cup," "N2O: Nitrous Oxide," "FreQuency," "Mad Dash Racing," "Gran Turismo 4," "Need For Speed: Underground," "Dance Dance Revolution: SuperNova," "Spiderman," and "Forza Motorsport."

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

26.    **TCM** realleges and incorporates herein by reference, to the extent applicable, each and every allegation contained hereinabove

27.    Based on the critical and commercial success of **TCM**'s music and recordings, on or about August 26, 2003, **TCM** entered into a joint venture with V2 Records, Inc. ("**V2**").

28.    A copy of the August 26, 2003 contract between **TCM** and **V2** (the "2003 Contract") is attached hereto as Exhibit A.

29.    Pursuant to the 2003 Contract, **TCM** was to deliver to **V2** an album which **V2** would then commercially distribute and exploit throughout the world.

30.    **TCM** abided by all of its obligations under the 2003 Contract, including delivery of the album *Legion of Boom*.

31.    Upon information and belief, on or about November 23, 2005, V2 transferred assets to **VRNA** and **SSE**.

32.    Upon information and belief, on or about November 23, 2005, **SSE** and **VRNA** assumed **V2**'s rights and obligations under the 2003 Contract.

33.    Upon information and belief, for a period of time after November 23, 2005, **SSE** and **VRNA** conducted business under the trade name "V2 Records" though they were no longer the same entity as **V2**.

34.    Upon information and belief, at all salient times since assuming **V2**'s rights and obligations under the 2003 Contract, **SSE** and **VRNA** have exercised all of the rights under the 2003 Contract and has breached all of their obligations to **TCM** under the 2003 Contract, including without limitation, the obligation to provide timely and accurate accountings as well as the obligation to pay **TCM** for the exploitation of the album *Legion of Boom* and recordings contained thereon.

35.    As a direct and proximate result of the breach of the aforementioned 2003 Contract, **TCM** has been damaged in an amount to be determined at trial.

**WHEREFORE**, plaintiffs pray for judgment as follows:

1.    General damages according to proof;

2.    An accounting of defendant's profits;

3.    Exemplary damages according to proof;

4.    Piercing the corporate veil against defendant and holding Michael Olsen, Joseph Petlow, Joseph Bianco and/or Anil Narang responsible for any judgment which defendant cannot satisfy;

5.    Plaintiff's attorney's fees;

6.    Costs of suit; and

7.    Such further relief as the Court may deem just.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby request a jury trial for all claims as provided for in Federal Rule of Civil Procedure 38.

Respectfully submitted,

**Dated:**    June 28, 2007
             New York, New York

**TROUTMAN SANDERS LLP**

By: _____
        Oren J. Warshavsky
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
Telephone: (212) 704-6213
Facsimile: (212) 704-8356
e-mail: Oren.Warshavsky@troutmansanders.com

*Attorneys for Plaintiffs*

**EXHIBIT A**

Sent By: ;                                   +;                    Feb-13-07   8:53PM;           Page 1

V2 Records, Inc.
14 East 4th Street
New York, New York 10012

August 26, 2003

Ken Jordan and Scott Kirkland
collectively p/k/a The Crystal Method
c/o Gail Perry, Esq.
2801 Laurel Pass Avenue
Los Angeles, CA 90046

The following sets forth the terms under which V2 Records ("V2") hereby enters into an exclusive recording agreement with Ken Jordan and Scott Kirkland collectively p/k/a The Crystal Method ("Artist").

1. Territory/Ownership: The Territory will be the World. All Masters embodying Artist's performances (individually, collectively, or otherwise [subject only to paragraph 11 below]), recorded during the Term of this agreement, are hereby exclusively licensed to V2 for the Exploitation Period free from any claims whatsoever by Artist or any other person. V2 will have the exclusive right throughout the Territory to copyright those Master Recordings in V2's name as the exclusive licensee thereof and to secure any and all renewals and extensions of copyright throughout the Territory. Subject to the provisions of this agreement, V2 will have the exclusive and unlimited right to all the results and proceeds of Artist's recording services during the Term, including, but not limited to, the exclusive, unlimited rights throughout the Territory, during the Exploitation Period: (a) to manufacture, advertise, sell, lease, license, distribute or otherwise use, exploit or dispose of, in any or all fields of use by any method now or hereafter known Records embodying Artist's performances; (b) to release Records derived from Masters under any name, trademark or label which V2 or its subsidiaries, affiliates or licensees may from time to time elect, provided that such label is company's top label imprint; (c) to perform such Masters publicly and to permit public performances thereof by means of radio broadcast, television and/or by any other method now or hereafter known; (d) to reproduce, adapt, transmit, communicate and/or otherwise use Masters, all upon such terms and conditions as V2 may elect, or at V2's discretion, to refrain therefrom. Notwithstanding the fact that certain Masters from the 1st Album may have been recorded prior to the date hereof, and notwithstanding anything to the contrary contained herein, the 1st Album Masters shall be deemed recorded during the Term hereof for all purposes.

"Exploitation Period": for purposes of this agreement shall mean the period of 9 years from V2's initial commercial release of the applicable Album in the United States (on an Album by Album basis), provided if at the end of such 9 year period, the joint venture Profit/Loss account is in a Net Loss position and/or Advances and/or ROW Advances have not been recouped hereunder, then such period shall be deemed extended until the joint venture Profit/Loss account reaches a Net Profits position, all Advances and ROW Advances have been recouped and Net Profits and/or ROW Royalties thereafter become payable to Artist hereunder. V2 will have a 6 month non-exclusive sell off period for all records released hereunder.

HH

In the event at any time prior to the expiration of the Exploitation Period, V2 has deleted the 1st Album or the 2nd Album from V2's catalog, Artist shall have the right to send V2 notice requesting that V2 reinstate the applicable Album; if V2 does not reinstate the applicable Album within 60 days after V2's receipt of such notice, the Exploitation Period for such Album will automatically terminate at the end of such 60 day period.

2. Term/Product Commitment/Delivery Standard: There will be an initial contract period, commencing as of the date hereof, and ending the last day of the 9th full month that follows the month in which Artist delivers the 1st Album, during which Artist will deliver 1 Album (i.e., the "1st Album"), plus 1 option on V2's part to extend the Term for an additional contract period, (to be exercised by V2 at any time during the initial contract period) commencing on expiration of the initial contract period and expiring on the last day of the 9th full month that follows the month in which Artist delivers the 2nd Album, during which Artist will record and deliver 1 Album (i.e., the "2nd Album"). The 1st Album will be required to be delivered on or before August 30, 2003. The 2nd Album will be required to be delivered within 9 months after V2's exercise of V2's option therefor (but in no event earlier than 12 months after Delivery of the 1st Album). Each Album will be subject to V2's approval as technically and commercially satisfactory for the manufacture and sale of records, provided each Album shall be deemed to meet this standard if it meets or exceeds the artistic style and quality of albums heretofore commercially released by Artist.

3. Recording Budget/Artwork Budget: For the 2nd Album, prior to any recording session for any master(s), Artist shall meaningfully consult with V2 with respect to the recording budget, which recording budget will include the following information: (i) the producer engaged by Artist and the financial terms of the agreement between Artist and such producer (the royalty provisions of which shall be subject to V2's consent), if any; (ii) selection of material, including the number of compositions to be recorded; (iii) specification of accompaniment, arrangement and copying services, (iv) recording fees or arranging fees and the proposed recipient thereof; (v) the dates of recording and mixing and studios where recording and mixing are to take place and (vi) schedule of all costs to be incurred in each recording session and all studio time.

Artist will prepare and deliver to V2 all artwork for the Album to be used in connection with each Album throughout the world (hereinafter, the "Artwork") upon all of the following conditions: (i) Before incurring any expenses whatever in connection with Artist's preparation of the Artwork, Artist will outline and discuss completely with the Head of V2's Art Department the proposed Artwork to be produced by Artist and all plans in connection therewith. At the same time, Artist will submit to the Art Department the budget for the Artwork (the "Artwork Budget"). V2 hereby approves an Artwork Budget for each Album of up to $20,000 (excluding sound tions). (ii) Artist will deliver all such Artwork prepared by Artist, together with paid invoices in connection therewith, to V2's Art Department not less than one hundred twenty (120) days prior to V2's projected release date for the applicable Album. (iii) Artist will deliver to V2, together with all such Artwork, an itemized statement of Artist's actual costs in connection therewith. (iv) V2 shall have the right to reject any Artwork which is not in accord with the previous outline and plan between Artist and V2's Art Department, or, which is not at least equivalent in quality to the average Artwork prepared by V2. (v) The Artwork and all other material delivered to V2 will be subject to V2's approval in respect of advocacy or illegal

2

HH

activity, and violation of any law or governmental regulation, and violation of any personal, property or other rights of any person, firm or corporation. (vi) If V2 rejects any Artwork, Artist shall have the right to revise and resubmit it for V2's approval, subject to all other conditions above. (vii) As between Artist and V2, all Artwork and related material delivered by Artist and accepted by V2 hereunder (and all copyrights therein (including renewals and extensions thereof) shall be owned by Artist and exclusively licensed to V2 for the Exploitation Period. (viii) All matters relating to V2's trademarks and manufacturing and distribution credits all legal notices and any website address of V2's shall determined in V2's sole discretion (provided V2 hereby agrees that Artwork ownership and copyrights and V2's license therein will be clearly identified in such Artwork). (ix) V2 shall have the right to affix to each record container hereunder an anti-counterfeiting or similar device, which shall be determined in V2's sole discretion. (x) V2 shall have the right to include or affix on each record or container hereunder UPC bar coding (xi) No Artwork will be deemed delivered until accepted by V2 and all requirements hereof have been fulfilled. Should Artist fail to submit Artwork in full compliance with the terms outlined above, V2 shall have the right to prepare and use V2's own Artwork.  Artwork approved for use in the United States must be used by V2 as album artwork throughout the world unless Artist agrees otherwise in writing.

If Artist requests the use of "Special Packaging" for an Album or other record delivered hereunder, V2 will not be obliged to accede to such request, provided in the event V2 does accede to such request, V2 shall have the right to recoup the additional cost per unit of such special packaging from any and all monies (excluding mechanical royalties) otherwise payable to Artist pursuant to this agreement. The term Special Packaging shall mean any record packaging which costs more to produce than Standard Packaging. V2's Standard Packaging is: (i) CD Album - Jewel case, folder (4 colors with no special colors), 8 panels, clear tray, 1 play card (4 over 4), 3 color CD plate; (ii) Cassette Album - Clear box , J-Card with 3 flaps (4 over 2), clear cassette, white on-cassette print; (iii) Vinyl Album - 4 color single sleeve, 2 color inner sleeve, 3 color vinyl label, black vinyl; (iv) CD Single - Slimline jewel case, single inlay card (4 over 0), 3 color CD plate; (v) 7" Vinyl Singles - Single sleeve (4 colors), 3 color vinyl label, black vinyl, no inner sleeve; (vi) 12" Vinyl Singles - Single sleeve (4 colors), 3 color vinyl label, black vinyl, white inner sleeve.

4. V2's Costs:  For the 1st Album, V2 will pay to Artist an all-in recording fund ("Fund") of $300,000, payable 50% promptly after full execution hereof and the balance, less recording costs paid by V2, if any, promptly after Delivery by Artist and acceptance by V2 (subject to the last sentence of paragraph 2 hereof) of the 1st Album. For the 2nd Album, the Fund will equal 66-2/3% of Artist's earned Net Profits for sales of the 1st Album with a Minimum of $300,000 and a Maximum of $900,000. The 2nd Album Fund will be payable 50% upon V2's exercise of its option therefor, and the balance, less recording costs paid by V2, if any, upon Delivery by Artist and acceptance by V2 (subject to the last sentence of paragraph 2 hereof) of the 2nd Album.  For the 1st Album Fund, $250,000 will be deemed a Deduction hereunder and the balance of such Fund will be deemed an advance against and recoupable out of any and all Net Profits payable hereunder ("Advance").  For the 2nd Album Fund, $200,000 of such Fund will be deemed a Deduction hereunder and the balance of such Fund will be deemed an Advance.

For the purposes of the foregoing calculations: (a) accounting statements rendered during the 12

3

HH

months following the initial release of the applicable Album(s) will be used; (b) reserves will be deemed not to exceed the greater of: (i) the difference between the number of records shipped and the number of records sold as shown by Soundscan and (ii) 25% of records shipped; and (c) V2 will make a good faith estimate of so-called "pipeline" income.

Artist will be responsible for and will pay all recording costs incurred in connection with each Album hereunder. V2 will be responsible for and will pay all manufacturing costs, marketing and promotion costs, mechanical royalties and V2-approved third party record royalties in connection with each Album hereunder.

5. Split Profits: (a) For the US and Canada, for each Album, V2 will credit to Artist's account (or pay, as applicable) 50% of "Net Profits". For purposes of this agreement, "Net Profits"/"Net Loss" shall mean Gross Receipts less Deductions. For the purpose of calculating Net Profits/Net Loss, the following definitions will apply: (i) "Gross Receipts" shall mean (A) V2's gross receipts and credits from customers, licensees and distributors, which are directly attributable to the sale and exploitation of Artist's records in the US and Canada, less any adjustments, returns, settlements, allowances, discounts, rebates and credits applicable thereto and (B) V2's gross receipts in respect of Cybersales in the US and Canada and (C) V2's gross receipts in respect of record club sales in the US and Canada and (D) any and all other gross income derived from the sale or other exploitation of Artist's records hereunder in the US and Canada; (ii) "Deductions" shall mean all direct, third-party, out-of-pocket costs and expenses incurred by V2 solely through the close of the applicable accounting period directly attributable to the manufacture, sale, distribution, marketing, promotion, advertising and exploitation of Artist's records in the US and Canada (including., without limitation, manufacturing costs, video production costs, artwork costs, marketing and promotion expenditures, tour support, independent publicity expenditures, monies payable or becoming payable to artist(s), producer(s), engineer(s), copyright proprietors and unions, mechanical royalties, recording costs paid by V2 (if any), EPK costs, but specifically excluding V2's "overhead" costs, and V2's third party Distribution Fee]. V2's third party Distribution Fee shall equal the actual third party distribution fee(s) payable to V2's third party distributor(s) in the US and Canada. Additionally, for sales of physical Records only (but not for record clubs or master use license income or Cybersales for the avoidance of doubt) V2 will be entitled to charge Artist with a "net" administration fee for V2 equal to 3% of Gross Receipts hereunder. In the event any marketing, promotion, artwork, publicity or other such costs include costs attributable to recordings other than recordings delivered hereunder, the applicable costs will be fairly apportioned so that only a pro-rata share of such costs will be charged to the joint venture Profit/Loss account hereunder.

(b) The world outside the US and Canada shall herein be referred to as "ROW". For net sales of Records in ROW, V2 will credit to Artist's ROW Royalty account (or pay, as applicable) a record royalty equal to: (1) for the 1st Album 15% PPD on Albums and 13% PPD on Singles; and (2) for the 2nd Album 16% PPD on Albums and 14% PPD on Singles, reduced, computed and paid on the same basis as V2 US is paid. Each of the foregoing rates will be 1% PPD higher for ROW Cybersales. If an Album achieves net sales of 250,000 units in ROW, each above-applicable rate will be prospectively increased by 2% PPD at such time (i.e., on an Album by Album basis). Notwithstanding the foregoing, in certain countries where V2 does not have an affiliate, V2 will have the right to distribute records under a third-party license. In such

4

stances, V2 will credit Artist's ROW Royalty account with the greater of: (i) such above applicable rate; and (ii) 50% of V2's US gross receipts (excluding advances) with respect to those particular records. Royalties for sales in ROW shall herein be referred to as "ROW Royalties". For the avoidance of doubt, V2 shall not have the right to apply a so-called packaging charge/container deduction or CD or New Tech reduction for ROW Royalties in respect of sales in V2's affiliate territories and ROW Royalties will not be reduced for so-called "midline" or "budget" prices without Artist's prior written approval.

For "Cybersales" in ROW, Artist's royalty will equal the applicable ROW Royalty rate set forth above, applied to a PPD equal to: (i) if the sale to the consumer is made by a third party dealing at arms length with V2, the price which V2 actually receives from or is credited with by such third party; or (ii) if the sale to the consumer is made by V2 directly, the price paid by the consumer ("Consumer Price") less any sales tax forming part of the Consumer Price and less any direct, out of pocket, third party fee payable to a credit card organization (a similar organization dealing with V2 at arms length) in respect of the collection of the Consumer Price and less any direct, out of pocket, third party fee payable to a technology provider for the use of the relevant technology by which such Cybersale is made.

(c) V2 will have the right to maintain a reasonable reserve against returns (not to exceed 25% unless V2 anticipates in its good faith judgement returns which justify the establishment of a larger reserve and, in no event greater than the reserve held against V2 by its distributor(s)) and will reduce, compute and otherwise pay Net Profits and/or the ROW Royalties in all respects in accordance with V2's standard terms and conditions and in accordance with customary music business practices. Within 30 days after V2's distributor(s) liquidate reserves against returns for US and Canadian sales, V2 will credit such sales to the joint venture Profit/Loss account hereunder. Artist will not be paid a record royalty on any so-called "free goods" for the avoidance of doubt.

(d) Statements (which will include all costs charged to the joint venture Profit/Loss account hereunder) will be rendered within ninety (90) days after the expiration of each semi-annual accounting period ending on June 30th and December 31st. Artist will have so-called "window protection" so that (i) Net Profits payable at the close of a particular accounting period may not be used by V2 to recoup Advances paid after the close of such applicable accounting period; and (ii) ROW Royalties payable at the close of a particular accounting period may not be used by V2 to recoup ROW Advances paid after the close of such applicable accounting period. Artist will be deemed to have consented to all accountings rendered by V2 hereunder and such accountings will be binding upon Artist and not subject to any objection by Artist for any reason unless specific objection, in writing, stating the basis thereof is given to V2 within two (2) years after the date V2 has rendered the applicable statement, and after such written objection unless suit is instituted within two (2) years after the date V2 has rendered the applicable statement.

(e)    (i) In respect of master use licenses for Artist's masters (such as synchronization, compilation, sampling, soundtrack album) where the use originates in the US and Canada, 100% of V2's gross income in the US and Canada "at source" will be credited to the joint venture Profit/Loss account hereunder until such account reaches a Net Profits position. Advances have been recouped. Thereafter, on a prospective basis and without regard to recoupment or the

5

position of the joint venture Profit/Loss account, 75% of V2's gross income "at source" will be credited to Artist and 25% of V2's gross income "at source" will be retained by V2.

(ii) In respect of master use licenses for Artist's masters (such as synchronization, compilation, sampling, and soundtrack album licenses) where the use originates in ROW: (A) 60% of V2's gross income "at source" will be credited to Artist's ROW account until the earlier of: (i) 12 months after the initial commercial release by V2 of the applicable Album; and (ii) V2's receipt of $250,000 in such gross income in ROW in respect of the Masters embodied in the applicable Album; and (B) 40% of V2's gross income "at source" will be retained by V2. Thereafter, on a prospective basis and without regard to recoupment or the position of the joint venture Profit/Loss account or Artist's ROW Royalty account, 70% of V2's gross income "at source" will be credited to Artist's ROW Royalty account and 30% of V2's gross income "at source" will be retained by V2. Such modifications to the master use license income splits under this subparagraph 5(e)(ii) will be based on income actually received by V2 in ROW and will be made on an Album by Album basis. V2 will credit to Artist's ROW Royalty account Artist's share of ROW master use license income within 30 days after V2's affiliate or licensee credits such income to V2.

(iii) Notwithstanding anything to the contrary contained herein, V2 will not pay any master use license income under 5(e)(i) or 5(e)(ii) above until the joint venture Profit/Loss account hereunder reaches a Net Profits position and all Advances and ROW Advances have been recouped. Commencing with the next regular semi-annual accounting date thereafter (i.e., immediately following March 31st or September 30th), V2 will thereafter prospectively account to Artist (and pay) master use license income on a monthly basis with no regard to recoupment or the position of the joint venture Profit/Loss account or Artist's ROW Royalty account. For the avoidance of doubt, no amounts paid to individuals hired by V2 to procure master use licenses (such as David Steel) will be deducted by V2 in the calculation of gross income for purposes of subparagraphs 5(e)(i) and 5(e)(ii) above without Artist's prior written consent.

It is hereby agreed that record royalties and fees payable in respect of the inclusion of Artist's master "Starting Over" in the forthcoming "Tomb Raider 2" soundtrack album and/or film will be paid directly to V2 and will be considered US master use license income for purposes of this agreement.

"ROW Advance", for purposes of this agreement, shall mean an advance recoupable solely from ROW Royalties hereunder. Subject to subparagraph 5(e)(iii) above, Artist's Net Profits account and Artist's ROW Royalty account hereunder shall be "cross-collateralized" throughout the Exploitation Period only as follows: (1) ROW Royalties will not be payable unless all Advances and ROW Advances have been recouped and Net Profits are payable to Artist hereunder; and (2) Net Profits will not be payable unless all Advances and ROW Advances have been recouped and ROW Royalties are payable to Artist hereunder. Notwithstanding the foregoing, in the event the joint venture Profit/Loss account is in a Net Loss position and ROW Royalties have accrued, then to the extent such ROW Royalties exceed 50% of the joint venture Net Loss, such ROW Royalties will be paid to Artist in accordance with the terms hereof, and, in the event Artist's ROW Royalty account is unrecouped and Net Profits have accrued, then to the

6

extent such Net Profits exceed Artist's unrecouped ROW Royalty account balance, such Net Profits will be paid to Artist in accordance with the terms hereof.

(d) For ROW: (i) 50% of independent promotion will be deemed an ROW Advance (except with respect to so-called "promo tours", the cost of which will be deemed non-recoupable); and (ii) 100% of tour support will be deemed an ROW Advance. Other than for videos (which will be governed by paragraph 7 below) all other amounts deemed by V2 to be ROW Advances must be approved in advance by Artist, provided Artist's acceptance of any tour support shall be deemed approval over V2's recoupment of such cost as an ROW Advance.

(e) An accounting statement example is attached hereto as Exhibit A. Such example is attached for illustrative purposes only and is meant to show the minimum level of detail which your accountings will include hereunder. Any and all sales, pricing, accounting projections, costs, fees etc. included in your accountings hereunder shall solely be governed by the terms of this Agreement.

6. Mechanical Royalties: For the US and Canada, controlled compositions embodied on Masters delivered hereunder will be and are hereby licensed to V2 at 100% of the minimum statutory rate (without regard to playing time formula) in effect on the date of V2's initial commercial release of the applicable master (except solely with respect to digital downloads of masters hereunder in connection with which such controlled compositions are hereby licensed to V2 at 100% of the minimum statutory rate [without regard to playing time formula] in effect on the date of V2's sale of the applicable Master). Mechanical royalties will be paid on the basis of records sold, except V2 will pay mechanicals on 50% of so-called "standard" album free goods. If a particular musical composition is embodied more than once on a particular record, V2 will pay mechanical royalties in connection therewith as though such composition were embodied on such record but once (except twice for singles). Notwithstanding anything to the contrary contained in this paragraph, the maximum aggregate mechanical royalties that will be paid in respect of any particular record will be 12 times the applicable foregoing rate for Albums, 5 times the applicable foregoing rate for EPs, 2 times the applicable foregoing rate for singles, 3 times the applicable foregoing rate for maxi-singles and all other records. All musical compositions will be available without charge for synchronization with promotional videos and all other promotional purposes. Any excess aggregate mechanical royalties under this paragraph shall be deemed an Advance. V2 will account quarterly with respect to mechanical royalties. V2 shall have the right to maintain a reasonable reserve against returns with respect to mechanical royalties (based on SoundScan figures but in no event less than 35% for albums and 50% for singles). Such reserve will be liquidated evenly over the six quarterly accounting periods immediately following the accounting period in which the applicable reserve is held.

7. Marketing: Artist will consult with V2 with respect to all creative matters (including choice of compositions, choice of single and Album sequencing).

V2 agrees to hire an independent publicist for each Album hereunder. All terms relating to the engagement of such independent publicist by V2 will be subject to the mutual approval of V2 and Artist.

LH

V2 and Artist will mutually approve the overall marketing and promotion plan and budget in advance of each Album release; provided that V2's decision shall be final with respect to the implementation of such plan and budget. V2 will have the right to perform day to day operations and make decisions in the ordinary course of business and within the scope of such plan and budget to effectuate such plan and to expend monies in connection with such plan and budget. A per Album marketing and promotion budget of not less than $300,000 and not more than $500,000 is hereby deemed pre-approved by the parties hereto.

All videos will be produced pursuant to mutually approved budgets. The director, concept, storyboard and cast of all videos will be subject to Artist's approval. V2 hereby commits to fund at least one promotional video in connection with the 1st Album hereunder. 75% of the production costs of each video shall be deemed a Deduction hereunder and 12½% of such costs shall be deemed an ROW Advance hereunder.

V2 will make available a budget of $5,000 in connection with the production of an EPK for the 1st Album, which budget V2 will administer.

During the Term, Artist will have the right to approve: (i) all likeness/photo/biographical material used by V2 (provided once approved by Artist, such likeness/photo/biographical material shall be deemed approved for all purposes hereunder) (ii) coupling Artist's Masters with Masters embodying the performances of artists other than Artist (except for V2 in house promotional samples and the inclusion of Artist's Masters in online subscription and/or digital sales services such as "I-Tunes", "MusicMatch", "Rhapsody", etc.) (iii) reducing the PPD to a mid-line price before 24 months from the full-priced release or to a budget price before 36 months from the full-price release and (iv) release of records through record clubs or mail order (v) premium releases (vi) editing, re-sequencing, re-mixing or otherwise altering any of the masters (vii) exploitation of outtakes (viii) synchronization licenses (ix) release of all record configurations other than Albums and singles hereunder (x) the commercial release of videos (xi) any commercial use of the Masters other than as part of Albums and singles hereunder (xii) the use of Masters in television commercials and/or advertisements.

Notwithstanding anything to the contrary contained herein, Artist hereby expressly approves the inclusion of all Masters hereunder in the "I-Tunes", "MusicMatch", and "Rhapsody" services and in any and all other online subscription and/or digital sales agreements heretofore or hereafter entered into by V2.

Artist shall have the right to approve the selling price related to the initial commercial release of the 1st and 2nd Albums hereunder.

Notwithstanding anything to the contrary contained herein, V2 and Artist hereby acknowledge and agree that any and all costs incurred by V2 in connection with the white label vinyl for "Starting Over" will be deemed a Deduction hereunder.

5. Release Commitment. V2 will release each Album in the United States within 90 days of Delivery. For purposes of calculating the above period, the period commencing on November 15th and ending on January 15th will be excluded. In the event that V2 fails to release the

8

applicable Album during such 90 day period in the US, Artist will have the right, within 30 days following the expiration of such period, to notify V2 of such failure and of Artist's desire that V2 correct such failure to release. If within 45 days of V2's receipt of such notice, V2 does not release the applicable Album in the US, Artist will have the right to terminate the Term of this agreement in which event the rights to the applicable unreleased Album shall thereby revert in Artist, subject to the next two sentences. Artist shall procure that in the event any Masters from such Album are thereafter released by Artist or any third party, V2 will be paid an override royalty "from record one" of 3% percent (pro-rated, if applicable) of the suggested retail list price on each record embodying any such Master (with no deductions whatsoever) until V2 has recouped the Fund and all recording costs paid in respect of the applicable unreleased Album, after which time no further override royalty will be paid to V2.

V2 will release each Album in UK, France, Benelux, Scandinavia, GAS, Italy, Greece, Canada, Australia and Japan ("Release Territories ") within 90 days of its United States Release. For purposes of calculating the above period, the period commencing on November 15th and ending on January 15th will be excluded. In the event that V2 fails to release the applicable Album during such 90 day period in any Release Territory, Artist will have the right, within 30 days following the expiration of such period, to notify V2 of such failure and of Artist's desire that V2 correct such failure to release in the applicable Release Territory. If within 45 days of V2's receipt of such notice, V2 does not release the applicable Album in the applicable Release Territory, Artist will have the right to cause V2 to enter into a third party license with respect to such applicable unreleased Album for the applicable Release Territory, on terms reasonably approved by V2. 50% of V2's "at source" receipts from any such license will be credited to Artist's ROW Royalty account hereunder and 50% will be retained by V2.

**Definitions**: For the purposes of this agreement, the following definitions shall apply:

(a) "Deliver," or "Deliver," in respect of Masters shall mean the actual receipt by V2 of completed, fully-edited mixed, Pro-Tools (or comparable quality) session files (including multi-tracks) with related backup files, as requested by V2 for all of the Masters, approved by V2 as technically and commercially satisfactory (subject to the last sentence of paragraph 2 hereof), which tapes shall in all respects be in the proper form for the production of the parts necessary for the manufacture and creation of records, together with V2's receipt of all materials, consents, approvals, licenses and permissions in respect of all of the Masters.

(b) "Record" and "record": any form of reproduction, distribution, transmission or communication of sound recordings, whether or not coupled with visual images, now or hereafter known, including those manufactured, distributed, transmitted or communicated primarily for home use, institutional (e.g., library or school) use, jukebox use or use in means of transportation, including, without limitation, any computer-assisted media (e.g., CD-ROM, DVD, CD Extra, Enhanced CD), and "Cybersales" (i.e., any form other than a physical distribution to consumer, including, without limitation, the downloading or other conveyance of Artist's performances in master(s) or video(s) concerned via telephone, satellite, cable, direct transmission over wire or through the air, and on-line computer sales).

9

HH

(c) "recording costs". Wages, fees, advances and payments of any nature (other than royalties) payable to musicians, vocalists, conductors, arrangers, orchestrations, engineers, producers; payments to a trustee or fund based on wages to the extent required by any agreement between V2 and any labor organization or trustee, all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; authoring costs; all costs of travel by persons other than V2 employees, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in the production, but not the manufacture, of Masters and records hereunder, which are then customarily recognized as recording costs in the recording industry.

(d) "master" or "master recording" or "Master" or "Master Recording" – The equivalent of a recording of a single selection or medley intended for use in the manufacture and sale of records.

(e) Warranty/Indemnity. Artist warrants and represents that: a) Artist has the right to enter into this agreement and grant all of the rights conveyed herein, b) the use of the Masters as herein contemplated will not violate the rights of any person or entity, c) Artist will comply with all applicable laws, union rules and regulations, d) neither the material selected or furnished by Artist and embodied on the Masters, nor any results or proceeds of Artist's services hereunder, nor V2's exploitation of Masters hereunder will infringe upon the rights of any third party, e) any samples or re-plays embodied on the Masters have been cleared by Artist, f) Artist has paid all recording costs in respect of the Masters delivered hereunder, g) Artist shall not perform (and has not performed) for the purpose of making Records for distribution or other exploitation in the Territory for anyone other than V2 and Artist shall not authorize the use of Artist's name (including any other name and/or pseudonym by which Artist is now known or may hereafter become known), likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records for anyone other than V2 in the Territory during the Term whatsoever; and h) Artist shall not during the five (5) years immediately succeeding expiry of the Term record or permit the recording of any musical composition embodied on a Master subject hereto. Artist shall indemnify and hold V2, and its related parties, harmless from any and all claims, liabilities, costs, losses, damages or expenses, including attorneys' fees, incurred by it by reason of Artist's breach of its warranties and representations hereunder. Upon the making or filing of any such claim or action against Artist, V2, V2 shall be entitled to withhold from any amounts payable to Artist under this agreement, such amounts as may be reasonably necessary to protect V2 and as are reasonably related to the potential liability at issue. If no action or other proceeding for recovery on such a claim has been commenced within twelve (12) months after its assertion, V2 will not continue to withhold monies in connection with it under this paragraph 12 unless V2 believes, in V2's reasonable judgment, that such a proceeding may be instituted notwithstanding the passage of that time. Artist shall have the right to post a bond in an amount equivalent to the sum being withheld by V2 in respect of any such claim with a good and sufficient surety approved by V2, provided that such surety agrees, unconditionally, in writing, to pay all costs, fees, or damages incurred by V2 by reason of such claim. Artist shall be given written notice of all such claims and shall have the right to participate in the defense thereof, at Artist's own cost and expense. V2's related parties shall include V2's officers, attorneys, employees and affiliated companies, and their respective officers, directors shareholders, employees, attorneys, holding companies, subsidiaries and affiliated companies.

10

HH

11. **Exclusivity Exception:** Notwithstanding anything to the contrary contained herein, and provided such activities would not in any material way interfere with the timely performance of the recording obligations provided in this agreement: (a) Artist will have the right to perform as a so-called non-featured "back-up musician", "background vocalist" or "sideman" with featured artist for third parties as long as: (i) Artist's name is used only on liner notes in a size, prominence and type style as is customary in the recording industry for the naming of sidemen credit in conjunction with any use of Artist's name on the liner of such album; (ii) Artist will not perform any step-outs, solos or duets in excess of 30 seconds in connection with such master recordings; (iii) V2 is accorded a courtesy credit; and (iv) in the event the performance is a step-out or solo or duet of any duration, no videos or singles will be manufactured or released without V2's prior written consent (not to be unreasonably withheld or delayed); (b) Artist will have the right to perform services as a producer of third parties and as a songwriter (including scoring and the recording of such scores) for film, television, video games and advertisements and to grant to third parties all rights of exploitation in respect thereof; and (c) Artist will have the right to perform as an actor in motion pictures or other visual media, the contents of which are dramatic and will allow Artist's visual and vocal (but not musical) performance, name and likeness to be used on or in connection with such motion pictures and copies thereof. Artist will also have the right to perform musically in films, provided no Record usage will be made of such performance without V2's prior written consent. In the event V2 consents to any such record usage, the terms of paragraph 5(e) above related to master use license income will govern all income related thereto.

12. **Miscellaneous:** This agreement (and all exhibits attached hereto) constitutes the entire agreement between V2 and Artist and cannot be altered, modified, amended or waived, in whole or in part, except by a writing signed by both parties hereto. Should any provision of this agreement be held to be void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. This agreement has been entered into in the State of New York and the validity, construction, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. The venue of any action, suit or proceeding arising from or based upon this agreement shall be the appropriate state and federal courts located in the County of New York in the State of New York. In connection with the foregoing, the parties agree to submit to the personal jurisdiction of those courts. All notices to be given by a party to the other party shall be addressed to the applicable party at the address set forth on page 1 hereof or at such other address as the concerned party shall designate in writing from time to time to the other party. All notices to either party shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested. Notices to V2 shall be sent Attn: President, with a simultaneous copy sent in the same manner to the same address, but Attn: Head of Business & Legal Affairs. Notices shall be deemed given when personally delivered or mailed, except that notices of change of address shall be effective only after actual receipt. In any action between the parties to enforce any of the terms of this agreement, the prevailing party shall, in addition to any other award of damages or remedy, be entitled to court costs and reasonable attorneys' fees.

11

HH

the event that: a) V2 fails to regularly employ a staff to perform in-house marketing, sales and promotion services; or b) V2 ceases to maintain U.S. offices; or c) V2 enters into liquidation or makes an arrangement for the benefit of creditors or has a petition for bankruptcy presented against V2 or any insolvency proceedings are commenced by or against V2 (but excluding a voluntary liquidation for the purposes of reconstruction or amalgamation), or a receiver or other custodian of any kind is appointed over all or any of V2's assets [and is not removed within 30 days after such appointment takes effect], then Artist will have the right to terminate this agreement and V2's rights in Masters hereunder will thereby expire. Notwithstanding the foregoing, subject to all of the terms of this agreement, V2 shall be entitled to assign its rights and obligations pursuant to this agreement without having to obtain any further consent from Artist to any entity which is owned or controlled by V2 or owned or controlled by any party who now or hereafter owns or controls V2 provided always that V2 shall remain primarily responsible for the discharge of V2's obligations pursuant to this agreement save to the extent they are discharged by such entity or party. For the avoidance of doubt this right of assignment shall be transferable in its own right to any assignee (or any subsequent assignee) pursuant to this agreement.

If the foregoing correctly reflects your understanding and agreement with us, please so indicate by signing below.

Very Truly Yours,

V2 RECORDS, INC.

By: _____

An Authorized Signatory


AGREED TO AND ACCEPTED:

By: _____

Ken Jordan

By: _____

Scott Kirkland

EXHIBIT A CRYSTAL SAMPLE ACCOUNTING

CRYSTAL METHOD "Sample" Accounting

| | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 |
|---|---|---|---|---|---|---|---|---|---|
| Gross Units Less Actual Returns | 50,000 | 25,000 | 23,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |

LH